The Essex county orphans court overruled exceptions to the first intermediate account of the United States Trust Company as trustee under the will of Frederick T. Ward, deceased, and approved the account. Exceptants appeal.
By the fourth item of the will is given to the executors "the sum of $60,000" in trust for testator's nephew, Frederick L. Ward, and the latter's wife for life, remainder to their children. The fifth item bequeaths to the executors "the sum of $12,000 in trust to invest, collect the income" *Page 556 
for the benefit of Lotten Anderson for life. The executors named were the wife of Mr. Ward and the Trust Company. Mrs. Ward did not qualify.
The Trust Company, as executor, did not pay to itself as trustee under the fourth paragraph $60,000, or under the fifth paragraph $12,000, but instead transferred to itself as trustee shares of corporate stock which the testator owned in his lifetime and which had a market value at the time of his death of $60,000 for the one trust and $12,000 for the other, and these shares (with minor exceptions) it continues to hold as trustee. The result has been lamentable. The trust funds have shrunk to about $14,000 and $3,000, respectively.
The Trust Company seeks justification in the statute. Comp.Stat. p. 2271 § 34:
"Whenever any testator shall have made, in his lifetime, any investment of money in municipal bonds or on bond secured by mortgage, or in the bonds or stock shares of any corporation, and the same bonds, mortgages or stock shares shall come or shall have come into the hands of the executor of or trustee under the will of such testator or of the administrator with the will annexed, to be administered, and such executor, administrator or trustee may, in the exercise of good faith and reasonable discretion, have continued such investment, or may hereafter continue the same, he shall not be accountable for any loss by reason of such continuance."
Appellants argue that this case is not within the statute, since the shares did not come into the hands of the trustee by virtue of the will; that the statute only authorizes the trustee to retain stock which it receives pursuant to the directions of the testator and does not justify accepting stock in payment of a pecuniary legacy or retaining stock which it has improperly accepted.
The bequest of "the sum of $60,000" is a pecuniary legacy which can be satisfied only by the payment of lawful money unless the legatee consents to accept securities. Halsted v. Meeker'sExecutors, 18 N.J. Eq. 136. Likewise with residuary gifts. "The general rule is that the residuary legatee has a right to insist that before the end of the first year after testator's death, the executors shall, if possible, convert all the assets into money, pay the debts, funeral and testamentary *Page 557 
expenses, and hand over the clear residue to the residuary legatee. 2 Wms. Ex. *1454. The legatee, residuary or other, may, however, in satisfaction of his legacy, consent to accept securities from the executors whether held by them for conversion under the general rule for settlement or under special directions of the will." Macy v. Mercantile Trust Co., 68 N.J. Eq. 235.
While a legatee who is beneficially entitled is responsible to no one if he consents to accept securities, the rule is otherwise with a trustee. "The trustee has no right to accept, without inquiry as to the character and sufficiency of the alleged securities, anything but cash, unless under compulsion of a decree, or, in case of a testamentary trustee, because the assets in the hands of the executor were such as it was necessary or at least prudent so to do." 65 C.J. 687. It has never been doubted but that a trustee under the residuary clause might claim the protection of the New Jersey statute when he had taken as part of the residue investments made by his testator and has continued to hold them. Parker v. Glover, 42 N.J. Eq. 559; Brown v.Brown, 72 N.J. Eq. 667; Beam v. Paterson Safe Deposit andTrust Co., 83 N.J. Eq. 628. The same rule applies to a pecuniary legacy and it was so held by Vice-Ordinary Fielder in In reBrown, 112 N.J. Eq. 499, although in that case the will expressly authorized the trustees to retain as investments any securities which he owned at death. See, also, Bearsdley v.Orphan Asylum, 76 Conn. 560; 57 Atl. Rep. 165; Duncklee v.Butler, 62 N.Y.S. 921.
The statute does not expressly refer to the acceptance of investments, but in order to give effect to the legislative purpose, it must be construed to protect a trustee in respect to his acceptance, equally with his continuance of the investments.
The trustee was justified in accepting and continuing the investments in question, provided it acted in good faith and with reasonable discretion.
The next point made by appellants is that the securities, when turned over to the trustee, were worth much less than $60,000 and $12,000. Whether this is so, depends upon the date when the trusts were set up, since the stocks had sufficient *Page 558 
market value when the testator died January 24th, 1929, and for a month or so thereafter and then began a long decline.
The assets which compose the Frederick L. Ward trust were actually transferred and new certificates issued to the Trust Company as trustee as follows: one hundred shares Fidelity Union Trust Company, January 14th, 1930; twenty-five shares Savings Investment and Trust Company, January 16th; one hundred shares Merchants and Newark Trust Company, January 18th; ten shares National Newark and Essex Banking Company, January 24th; and two hundred shares Firemen's Insurance Company, January 25th, 1930. In addition, the executor held shares of United States Securities Investment Company, a corporation which wound up and distributed its assets among its stockholders. From this source, the Trust Company on January 15th, 1930, invested $2,625 for the trust in mortgage securities of the United States Mortgage and Title Guaranty Company.
The executor transferred to itself as trustee for Lotten Anderson two hundred and fifty shares of Guaranty Company of New Jersey, January 14th, 1930, and fifty shares Eagle Insurance Company in February, 1930. Also for this trust $1,000, the proceeds of United States Securities Investment Company shares was invested January 15th, 1930, in bonds of United States Mortgage and Title Guaranty Company. There is no evidence when any of the old certificates were endorsed or surrendered for transfer.
All the dividends on these stocks from testator's death until the dates of transfer were collected by the executor and entered in its books of account as income of the estate of Frederick T. Ward, deceased. The dividends were not currently allocated to the Frederick L. Ward trust or the Anderson trust. On January 28th, 1930, the Trust Company opened on its books an account entitled Frederick L. Ward trust and charged itself as trustee with the dividends received by it as executor in 1929 and January, 1930. A similar account was opened for the other trust. The presumption is that the several securities now found in the two trust funds became part of the trusts and were accepted by the trustee for that *Page 559 
purpose when the shares were actually transferred to the Trust Company as trustee. Or to state the converse — as long as the shares stood in the name of decedent or his executor, they were presumably part of his general estate.
The trustee claims that these shares were actually allotted to the two trusts and accepted by it as trustee in February, 1929. To succeed in this, it must show by satisfactory proof not merely that the allotment was contemplated or intended at that time, but that equitable title shifted from executor to trustee, or at least that a cause of action arose so that the trustee could be compelled to take the stock or pay damages for refusing to do so. The proofs fall far short. They do not even disclose a definite decision until shortly before the transfers were actually made.
 * * * * * * *
I am satisfied that the securities constituting the two trusts cannot be considered as accepted by the trustee until the several dates the shares were transferred. Their values at that time (taking the Mortgage Guaranty Company securities at par) were $47,250 and $8,500. The trustee is chargeable with the difference between these figures and the amounts it should have received, namely, $60,000 and $12,000. In re Brown, supra.
In January, 1930, the Trust Company as trustee for Frederick L. Ward and his wife and infant children, had the option of taking from the estate $60,000 and investing it pursuant to the statute, or accepting the securities which were transferred to it. The good faith of the trustee is not attacked. The question is whether it exercised reasonable discretion when it failed to take the money. In making its decision, the company should not have been, and I presume was not, influenced by any consideration for the residue of the estate — fear the estate might lose a $1,000 or so, in converting securities in order to raise the money. The duty of the trustee now under consideration was owed solely to the beneficiaries of the particular trust.
The decision was not made at a time when the financial skies were clear. The great stock market crash had occurred *Page 560 
the preceding fall. Business had declined. A constant topic of conversation was whether business would recover promptly or whether the country was faced by a period of hard times. The year 1930 began in a general feeling of uncertainty.
The Trust Company put the Frederick L. Ward trust in mortgage securities of $2,625, stock of the Fidelity Union Trust Company of a market value of $22,400, stock of three other banks located in Essex county, worth $15,575, and stock of the Firemen's Insurance Company $6,650. The market value of these stocks had been declining steadily for a year past and in January, 1930, was twenty-three per cent. less than a year earlier. The dividend yield was 4.6 per cent. on market value.
If a man and his wife, customers of the bank, had sought advice from its president, Mr. Brown, or its trust officer, Mr. Reed, in January, 1930, and had said, "we have $60,000 to invest. It comprises our entire estate. We are not interested in enlarging the principal but wish to keep it intact and eventually leave it to our children, and meanwhile to obtain for ourselves a reasonable income. In what shall we invest?" — they would have been told that the times were uncertain; that they had better put most of the fund in good bonds, for instance, United States Fourth Liberty Loan four and one-halfs at one hundred and one and one-half, or New Jersey four and one-halfs at par, or Newark four and one-halfs at ninety-six; some in guaranteed mortgages, and perhaps $5,000 or $10,000 in good stocks. No ordinarily prudent man would have recommended putting ninety-five per cent. of the fund in common stocks — certainly not in unlisted securities of a single locality.
The Trust Company invested its own funds in good bonds. "We did not invest in stocks," said Mr. Brown, "because it was against our policy." Again he stated, "in times of depression, stocks usually go down faster than bonds."
Of course, in a case of this kind, it is difficult not to be influenced by hindsight, but I do not think subsequent disaster is the ground of my decision. If the question should arise whether to-day a trustee should take $60,000 in cash, or, in *Page 561 
lieu thereof, local bank and insurance stocks, any cautious man, I believe, would advise taking the money.
The securities composing the Frederick L. Ward trust steadily depreciated in value from the time they were acquired by the trustee until it filed its account which is now under review. The fund has shrunk about seventy-five per cent. The court of errors and appeals has held that such a situation shows prima facie a failure to exercise reasonable discretion on the part of the trustee and casts upon the trustee the burden of proving that it used reasonable discretion. Beam v. Paterson Safe Deposit andTrust Co., 81 N.J. Eq. 195. In cases of this sort in which a trustee has been exonerated, the losses usually come from a sudden and unexpected catastrophe. In the Beam Case, the trustees held stock in street railway companies. The lessee of the companies became insolvent and were ordered to surrender the leases, at about the same time the existence of an old mortgage became known. Immediately, there was no market for the securities which the trustees held. Coddington v. Stone, 36 N.J. Eq. 361,
arose from the great Chicago fire; Parker v. Glover,supra, from a bank failure in 1873; Harris v. Guarantee TrustCo., 115 N.J. Eq. 602, from the collapse of a real estate boom. "The collapse came suddenly, practically over night." In rePettigrew, 115 N.J. Eq. 401; Peoples National Bank, c., v.Bichler, 115 N.J. Eq. 617, and In re Gross, 117 N.J. Eq. 420,
deal with the crash of the stock market in October, 1929. In the present instance, nothing of the sort occurred. The trustee accepted stocks which had been declining for a year and which continued to decline steadily thereafter. The excuse of the trustee is, in effect, that all securities declined in value from January, 1930, to January, 1933. This is true, in a measure, but it is not shown that even the average common stock declined as much as the stocks held by the trustee. My memory is that they did not.
The trustee does not appear to have made adequate inquiry about the value of the securities which it accepted. Market value of stocks is dependent in the long run upon the value of the property which they represent and upon the earnings *Page 562 
available for dividends. The trustee does not seem to have calculated even the book value of the shares or to have ascertained whether the several companies were earning the dividends (if any) paid. The nature of the trustee's investigation appears from the evidence of Mr. Brown.
"Q. Mr. Brown, what, if any investigations into the details of the business operation and financial standing of Firemen's Insurance Company did you make in 1929, for instance, which was the first year of this trust? A. Well, we considered every one of these stocks. Q. Excuse me, but I asked you ____. A. Alright, I will come to that. When we came to the Firemen's Insurance Company, it was considered the same as the rest of them. * * * I made inquiries. I was in constant touch with a local securities man calling me on the telephone every day; many times a day. I would inquire from them, the brokers of Newark, the local brokers, ask them what they thought of Firemen's Insurance Company. They thought it was one of the best insurance companies in the country without exception. They all agreed upon it. Q. Did you know what they knew definitely about the Firemen's? A. No."
If the trustee has sustained the burden of proof in this case, it would be difficult to find a case in which the burden is not sustained.
There is another and very important feature of this trust. The officers of the bank were well aware that one of the first principles of safe investment is diversity in the type of investment and in the localities upon which these securities depend. Yet they invested the entire fund in the securities of companies located in Essex county. None of the stocks were listed on any exchange, or were saleable outside the local market. Eighty per cent. of the fund was invested in the shares of banks dependent for their success on the continued prosperity of Newark and vicinity; nearly half the fund, in the stock of a single bank. The officers of the Trust Company, though acknowledging that safety demanded diversity, ignored the principle in practice.
The law in this regard is stated in the comment to section 228 of the Restatement of the Law of Trusts. "The trustee *Page 563 
is under a duty to the beneficiary to exercise prudence in diversifying the investments so as to minimize the risk of large losses and therefore he should not invest a disproportionately large part of the trust estate in a particular security or type of security. It is not enough that each of the investments is a proper investment under the rule stated in section 227."
Counsel for the trustee intimate that the man of ordinary caution, who is the measuring rod for a trustee, is a careless fellow; that with safety to himself, though with disaster to the beneficiaries of the trust, he may disregard all warning signals and may fail to stop, look and listen when crossing dangerous ground. I think the standard is not that low. The man of ordinary caution would not have subjected the property of another to the risks which the Frederick L. Ward trust ran.
What I have said of the Frederick L. Ward trust applies equally to the Anderson trust. The trustee, in my opinion, did not exercise reasonable discretion in the acceptance of the securities.
The testator gave the residue of his estate to his executors in trust for his wife for life, remainder to nieces and nephews. The final report of the Trust Company as executor showed that on January 31st, 1930, the residuary estate consisted of:
 Cash .................................. $6,997.86
 Ward Investment Co. ................... 149,360.33
 Local Common stocks ................... 158,525.00
 Miscellaneous ......................... 7,400.00
 ______________
 $322,283.19

Appellants are estopped by the decree on that account from questioning the wisdom of the Trust Company's holdings on the date mentioned, January 31st, 1930. Between that day and the date of the first account of the trustee, the company sold miscellaneous securities of a book value of $1,170; it received. August 8th, 1930, a liquidating dividend of $5,000 on one of the local bank stocks, and continued to hold the rest of the investments. Was it grossly negligent in doing so? *Page 564 
The Ward Investment Company was wholly owned by the Ward family. There was no market for its stock and therefore the trustee was justified in continuing to hold it. Whether or not the trustee should have retained its common stock in other Essex county corporations, depends somewhat on the nature of the assets represented by the Ward investment shares. A piece of real estate on Broad street, Newark, amounted to forty-nine per cent. of the assets of that company; Fidelity Union and Firemen's stock constituted forty-eight per cent. So, of the figure $149,360.33, at which the executor valued its holdings in the Ward Investment Company, $70,500 represented local stocks and made the investment of the residuary estate in securities of that class $229,000 out of a total estate of $322,000.
This portfolio is too lopsided for safety. But when it was submitted to the orphans court in 1930, no one objected and so it was approved. After such approval, a man of ordinary caution might feel justified in continuing the investments. True, they steadily dropped in value, but one always hopes for an upturn.
Decree of the orphans court will be affirmed as to the residuary estate and reversed so as to charge the trustee with the losses sustained by the Frederick L. Ward and Anderson trusts.